**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**


KAREN DAVIDSON, DEBBIE
FLITMAN, EUGENE PERRY,
SYLVIA WEBER and AMERICAN
CIVIL LIBERTIES UNION OF
RHODE ISLAND, INC.,

    Plaintiffs,

    v.                                    C.A. No. 14-91L

CITY OF CRANSTON, RHODE
ISLAND,

    Defendant.


**<u>MEMORANDUM AND ORDER</u>**

    RONALD R. LAGUEUX, Senior United States District Judge.

This matter is before the Court on the parties' cross motions for

summary judgment.  The Complaint was brought by four named

plaintiffs, all residents and registered voters from Cranston,

Rhode Island, along with The American Civil Liberties Union of

Rhode Island, Inc., on behalf of its members who reside in

Cranston (henceforth collectively identified as "Plaintiffs").

Defendant is the City of Cranston, Rhode Island.  Plaintiffs

allege that the Redistricting Plan adopted by Cranston in 2012

violates the Fourteenth Amendment of the United States

Constitution, because the inclusion of the State's entire prison

population in a single city ward operates to dilute the voting

strength and political influence of the residents of the other

wards.  For the reasons explained below, the Court denies Defendant's motion for summary judgment; instead granting summary judgment in favor of Plaintiffs.

## Background

Cranston's 2012 Redistricting Plan is based on population numbers generated by the United States Census Bureau as part of its every-ten-year census count, most recently undertaken in 2010.  As this Court explained in its earlier decision (denying Defendant's motion to dismiss, at 42 F. Supp.3d 325, 326 (D.R.I. 2014)), the Census Bureau has historically counted prison inmates as residents of the district where their prison is located.  In 2010, the Census Bureau counted 3,433 prisoners at Rhode Island's only state prison, the Adult Correctional Institutions (the "ACI"), and included the prisoners as Cranston residents.  When Cranston drew its city ward boundaries in 2012, it included the entire prison population in Ward Six, where the ACI is geographically located.

According to the Census, as of April 2010, Cranston had a total population of 80,387, with Ward Six's population at 13,642. Cranston has a total of six wards, each made up of approximately 13,500 residents.[1]  According to Defendant, the total maximum deviation among the population of the six wards is less than ten percent.  However, if, as Plaintiffs advocate, the prisoners are

---

[1] The largest ward, Five, has a population of 13,817.

subtracted from Ward Six's population, its total population is reduced to 10,209. Without the prison population, the deviation between the largest ward and Ward Six is approximately 35%.[2]

Each ward elects one representative to the City Council and one to the School Committee.  Additionally, three at-large city councilors and one at-large school committee member are selected by voters from all six wards.  Although the City includes ACI's prison inmates in Ward Six, the majority of inmates cannot vote in the Ward.  Rhode Island's Constitution states that no one who has been convicted of a felony may vote while incarcerated.  R.I. Const. Art. II, § 1.  Prisoners at the ACI for reasons other than a felony conviction may vote only by absentee ballot at their pre-incarceration domiciles.  Rhode Island Gen. Laws § 17-1-3.1(a)(2).  According to the demographic experts retained by the parties, 153 or 155 prisoners came from Cranston at the time of the Census.  Eighteen of those had pre-incarceration addresses located in Ward Six.

The population of the ACI is transient.  Inmates may be serving sentences or awaiting trial.  According to Plaintiffs' demographic expert, the median length of stay for those serving a sentence at the ACI is 99 days.  The median stay for those awaiting trial is three days.  The ACI's principal research

---

[2] Plaintiffs state that the total maximum deviation among all the wards (with the prison population omitted) is 28.12%.

technician Caitlin O'Connor stated that approximately 37% of the population is serving a felony sentence.  Applying that percentage to the eighteen inmates with pre-incarceration addresses in Ward Six leaves between six and seven inmates who could be eligible to vote in Ward Six.

The ACI inmate population does not participate in the civic life of Cranston or Ward Six.  Inmates are only rarely permitted to leave the facility.  Approximately 15-25 inmates from minimum security check out on a daily basis to participate in work release programs.  A slightly larger number, 60-100, leave the prison for work details, but are prohibited from interacting with the public.  Similarly, some inmates may be furloughed for family or health emergencies, at which time they are accompanied by correctional officers and are not permitted to interact with the public.  Inmates may not leave the prison to visit in the community, make use of parks or other municipal recreational facilities, use the roads or ride on public transportation. In addition, they are not able to send their children to Cranston public schools based on their ACI address.

The City provides only minimal services to the ACI, which is located on a state-operated campus.  Although the Cranston police occasionally deliver a prospective inmate to the prison, most requests for police services are handled by the State Police, which maintains an office at the ACI.  The Cranston Fire

Department does provide services to the ACI, although calls to
the ACI represent only a negligible percentage of the
Department's total calls per year.

Cranston's elected officials do not campaign or endeavor to
represent their ACI constituents.  Nor do they enact regulations
or ordinances that bear on conditions at the ACI.  Ward Six city
councilor Michael Favicchio is in his third term and campaigned
actively in the Ward in 2010, 2012 and 2014.  However, his only
trips to the ACI have been made in connection with his law
practice.  The school committee member from Ward Six, along with
the four at-large elected officials, report that they have had no
contact with anyone incarcerated at the ACI.  Similarly, Mayor
Allan Fung, who has served as Cranston's mayor since his election
in 2008, reports that he has only visited the ACI once during his
mayoral tenure, for a tour of the facility.  He recalls no
contact with any inmates during this visit.  Mayor Fung remembers
receiving a letter from an inmate complaining about her medical
care, but he doesn't think that he responded to the letter.
There is no record of the City Council discussing any issues
relating to the welfare of ACI's inmates, or of any city
councilor being contacted by family members on behalf of any ACI
inmate.  As might be expected, in deposition testimony, these
officials all reported expending much time and effort in
canvassing and outreach to other Cranston residents during their

campaigns, and in constituent services following their elections.

Plaintiffs' Complaint states one cause of action: that Defendant's Redistricting Plan violates Section 1 of the Fourteenth Amendment of the Constitution, causing them ongoing and irreparable harm by diluting their votes in municipal elections.  Plaintiffs seek a declaration that the Redistricting Plan is unconstitutional, and they seek to enjoin future elections in Cranston until an acceptable plan is developed.

### Standard of Review

When ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences in the light most favorable to the nonmoving party.  Continental Cas. Co. v, Canadian Univ. Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991).  Once this is done, Rule 56(c) requires that summary judgment be granted if there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law. A material fact is one affecting the lawsuit's outcome.  URI Cogeneration Partners, L.P. v. Board of Governors for Higher Education, 915 F.Supp. 1267, 1279 (D.R.I. 1996).  The ultimate burden of persuasion is on the moving party to show that the undisputed facts entitle it to summary judgment as a matter of law.  Jaroma v. Massey, 873 F.2d 17, 20 (1st Cir. 1989).

The analysis required for cross motions for summary judgment is the same.  Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st

Cir. 2009) ("The presence of cross-motions neither dilutes nor distorts this standard of review.").  In evaluating cross-motions, the court must determine whether or not either party is entitled to judgment as a matter of law based upon the undisputed facts.  Id.  In the present case, the parties disagreed about some of the population figures and some of the mathematical calculations.  Where possible, the Court relied on the Census figures and other uncontested figures.  At any rate, the discrepancies noted by the parties were not material to the outcome of the dispute.

### Analysis

In ruling on Defendant's Motion to Dismiss, this Court reviewed Supreme Court voting-rights jurisprudence and the notion of "One Man, One Vote."  42 F. Supp. 3d at 327-31.  The right to vote and the right to have one's vote counted are fundamental tenets of our democracy.  Wesberry v. Sanders, 376 U.S. 1, 17 (1964).  In Reynolds v. Sims, the Supreme Court held that it was constitutionally unsustainable to draw district lines so that "the votes of citizens in one region would be multiplied by two, five, or 10 times for their legislative representatives, while the votes of persons in another area would be counted only at face value."  377 U.S. 533, 563 (1964).  The right to petition elected officials, a right not limited to voters, is also fundamental to representative government, and is equally

vulnerable to unconstitutional dilution if an official in one
district represents more people than those represented by the
official the next district over.  California Motor Transport Co.
v. Trucking Unlimited, 404 U.S. 508, 510 (1972).

The Supreme Court has historically urged that voting
districts be drawn so as to equalize population.  This was in
part based upon a not-unreasonable assumption that equal
population groups would naturally include substantially equal
numbers of voters.  At times, however, the Court has skirted
around instances where districts with equal population have
yielded disparate numbers of voters.  Kirkpatrick v. Preisler,
394 U.S. 526, 534 (1969), Burns v. Richardson, 384 U.S. 73, 92
(1966), see also Garza v. County of Los Angeles, 918 F.2d 763,
773-74 (9th Cir. 1990) (Kozinski, J., dissenting).  However,
since this Court's ruling on Defendant's motion to dismiss, the
Supreme Court addressed and resolved some of the tension and
confusion between representational equality and electoral
equality, in Evenwel et al. v. Abbott, __ U.S. __, 136 S.Ct. 1120
(2016).

### *Evenwel*

In Evenwel,[3] voters sued Texas' governor and secretary of
state, objecting to the district lines drawn for state senate

---

[3] Evenwel was issued by an eight-member Supreme Court, with
two judges filing concurring opinions.

elections.   Texas had drawn its lines according to population

data, dividing the population into districts with a total

population deviation of 8.04%.   136 S.Ct. at 1125. (In <u>Brown v.</u>

<u>Thomson</u>, 462 U.S. 835, 842 (1983), the Supreme Court held that a

maximum deviation between the largest and smallest district of

under 10% is presumptively constitutional.)   The problem,

according to the <u>Evenwel</u> appellants was that the numbers of

eligible voters in each district varied by a much wider margin –

over 40%.   136 S.Ct. at 1125.   The solution urged by appellants

was to redraw the districts using citizen-voting-age-population

(CVAP) data generated by the U.S. Census Bureau.   <u>Id.</u> at 1126.

The Supreme Court rejected these arguments, siding with the

United States:

> Equalizing total population, the United States
> maintains, vindicates the principle of representational
> equality by "ensur[ing] that the voters in each
> district have the power to elect a representative who
> represents the same number of constituents as all other
> representatives."

<u>Id.</u> at 1126.

Following a review of history back to the Founding Fathers,

the Court concluded that "representatives serve all residents,

not just those eligible or registered to vote."   <u>Id.</u> at 1132.

The Court continued:

> Nonvoters have an important stake in many policy
> debates – children, their parents, even their
> grandparents, for example, have a stake in a strong
> public-education system – and in receiving constituent

> services, such as help navigating public-benefits
> bureaucracies.  By ensuring that each representative is
> subject to requests and suggestions from the same
> number of constituents, total-population apportionment
> promotes equitable and effective representation.

Id.

Defendant in the present case argues that Evenwel stands

simply for the constitutional propriety of drawing district lines

based on Census population data.  But to stop at that holding is

to overlook the Supreme Court's emphasis on the conceptual basis

of representational equality.  In its review of the drafting

history of the Constitution and later the Fourteenth Amendment,

the Supreme Court repeatedly stresses the prevailing view that

women, children, slaves, tax-paying Indians and non-land-holding

men (in some areas) all deserved representation – though none of

these groups could vote.

> In other words, the basis of representation in the
> House was to include all inhabitants – although slaves
> were counted as only three-fifths of a person – even
> though States remained free to deny many of those
> inhabitants the right to participate in the selection
> of their representatives.  Endorsing apportionment
> based on total population, Alexander Hamilton declared:
> "There can be no truer principle than this – that every
> individual of the community at large has an equal right
> to the protection of the government."

Id. at 1126 (emphasis in the original).

The inmates at the ACI share none of the characteristics of

the constituencies described by the Supreme Court.  They don't

have a stake in the Cranston public school system and they are

not receiving constituent services, such as help with public-benefits bureaucracies.  They are not making requests of and suggestions to Cranston elected officials (or if they are, they are receiving no response), nor are they receiving "the protection of government," at least not from Cranston elected officials.  Nonetheless, their numerical presence in the Ward is unfairly inflating the voice of the Ward's other inhabitants.

ACI's inmates are different from other groups of non-voting residents of Cranston, such as the students at Johnson & Wales University mentioned by Defendant.  The Supreme Court has previously upheld the inclusion of groups such as college students and military personnel in voting districts, based on principles of representational equality.  See Kirkpatrick, 394 U.S. at 530.  College students, for example, may register to vote from their campus addresses, and, whether they vote or not, they are free to contact local elected officials to voice their viewpoints.  They are most certainly affected by municipal regulations.[4]  In contrast, were the Cranston City Council to enact any ordinance bearing on the treatment of inmates or other

_____

[4] Just last year, Providence's City Council contemplated enacting a three-student tenancy limit for single family houses in response to rowdy parties near the campus of Providence College.  And students at the University of Rhode Island protested the Town of Narragansett's practice of placing off-campus houses on a Nuisance House List and marking them with big orange stickers, notifying local police of which places to monitor.

-11-

conditions at the ACI, it would no doubt be preempted by state law and therefore unenforceable.  Because of these distinctions, the Court cannot stretch the holding of Evenwel to cover the inmate population at ACI.

### *Calvin v. Jefferson County*

A federal court in Florida recently issued a ruling in a voting rights case with facts almost identical to the facts before this Court.  Calvin v. Jefferson County Board of Commissioners, Case No. 4:15CV131-MW/CAS, 2016 WL 1122884 (N.D. Florida).  Florida's Jefferson County is divided into five districts, with each district electing a county commissioner and a school board member.  With a total population of 14,761 in the county (based on 2010 U.S. Census figures), each district has a total population of approximately 3,000.  The Jefferson Correctional Institution, a state facility operated by the Florida Department of Corrections, is located in District 3.  The prison population tallies 1,157 inmates, with only nine of those convicted in Jefferson County.  Based upon opinions issued by the Florida Attorney General interpreting state statute, Jefferson County officials were advised that they were required to include the population of the prison when drawing district lines with substantially equal populations. 2016 WL 1122884, at *5. Nonetheless, Judge Mark Walker held that the inclusion of the prison population in the County's districting plan was

unconstitutional.  Id., at *24.

Judge Walker's opinion is well-reasoned and extensive.  This
Court, feeling the time pressure of Cranston's redistricting task
ahead, focuses only on its most salient points.  Analyzing the
civic and political roles of elected representatives and
community members, or "denizens," Judge Walker concluded that the
"JCI" inmates lack a fundamental and necessary "representational
nexus" with the County district.  Id., at *22.  In coming to this
conclusion, Judge Walker developed a test:

> An apportionment base for a given legislative body
> cannot be chosen so that a large number of nonvoters
> who also lack a meaningful representational nexus with
> that body are packed into a small subset of legislative
> districts.  Doing so impermissibly dilutes the voting
> and representational strength of denizens in other
> districts and violates the Equal Protection clause.[5]
> For Plaintiffs to prevail in this case, they have
> to show that the JCI inmates comprise a (1) large
> number of (2) nonvoters who (3) lack a meaningful
> representational nexus with the Boards, and that
> they're (4) packed into a small subset of legislative
> districts.

Id., at *18.

The harm of malapportionment, Judge Walker concluded, is not
a structural harm, but is instead harm to the individual.

> The constitutional infirmity in a set of malapportioned
> legislative districts lies not in the failure to
> equalize some population measure, but in the
> infringement of some peoples' rights to participate in

---

[5] Judge Walker also based his ruling on a separate Equal
Protection analysis which addresses the arbitrary inclusion or
exclusion of particular groups from voting districts.  Id., at
*16.

our form of representative democracy.  Put another way,
when a suit challenging a districting scheme reaches
federal court, the court does not sit as a super-
legislature to question the districting choices of the
legislative body from a policy standpoint.  Rather, the
court functions in its  traditional role as a
vindicator of individual rights.

Id., at *8.

Like the inmates in at the Jefferson County prison, the

ACI's inmates lack a 'representational nexus' with the Cranston

City Council and School Committee, as demonstrated by the facts

set forth above.  And, as in Jefferson County, the district lines

for Cranston's wards serve to dilute the voting strength and

political influence of the residents of wards 1, 2, 3, 4 and 5,

thereby causing an infringement of the individual constitutional

rights of the residents of those wards.  For every vote that ten

residents of those wards casts to elect a city councillor or

school committee member, the officials in Ward Six need only get

seven votes to prevail.  Likewise, when campaigning in Ward Six,

a candidate need only knock on seven doors, rather than ten doors

in the other wards.  And, when serving on behalf of Ward Six, its

officials are only held accountable to approximately 7/10 the

number of constituents compared with the other wards.  This is

constitutionally untenable.  Consequently, the Cranston City

Council is hereby ordered to create a new districting plan.  The

inmate population of the ACI must be subtracted from the total

population, and the lines must be drawn with substantially equal

numbers of people in each ward.  For purposes of this ruling, the inmate population of the ACI is 3,433.

## **Conclusion**

For these reasons, the Court denies Defendant's motion for summary judgment and grants Plaintiffs' motion for summary judgment.  Declaratory judgment is hereby entered on behalf of Plaintiffs on their Complaint.  The City of Cranston, the Cranston City Council and the City's Board of Canvassers are enjoined from holding further elections under the current ward districting plan.  The Cranston City Council shall have thirty days from the entry of this Order to propose a districting plan that complies with this Order, and with all other applicable federal and state laws to the extent those state laws are compatible with federal law.

It is so ordered.


/s/Ronald R. Laqueux
Ronald R. Lagueux
Senior United States District Judge
May  24  , 2016